## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Chelsea I.B.,                                     Case No. 18-cv-2874 (ECT/ECW)

        Plaintiff,

   v.                                        **REPORT AND RECOMMENDATION**

Andrew Saul,[1] Commissioner
of Social Security,

        Defendant.

This matter is before the Court on Plaintiff Chelsea I.B.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 11) and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Motion for Summary Judgment (Dkt. 13).  Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits.  This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed below, the Court recommends that Plaintiff's Motion be granted in part and denied in part, and Defendant's Motion be denied.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul, Commissioner of Social Security, is automatically substituted as a party in place of Nancy A. Berryhill, former Acting Commissioner of Social Security.

# I.    BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits ("DIB") on September 20, 2013, and an application for Supplemental Security Income ("SSI") on January 14, 2014.  (R. 349-50, 360-65.)[2]  Plaintiff asserted that her disability started on March 1, 2012.  (R. 349, 360.)  Her date last insured for DIB was March 31, 2015.  (R. 18.)  Plaintiff's applications were denied initially and upon reconsideration.  (R. 151, 153, 182, 183.)  Plaintiff sought and received a hearing before ALJ Virginia Kuhn ("ALJ") on December 29, 2015.  (R. 51-91.)

On January 28, 2016, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 187-203.)

Subsequently, the Appeals Council remanded Plaintiff's case back to the ALJ instructing the ALJ in relevant part as follows:

> The Appeals Council grants the request for review under the additional evidence provision of the Social Security Administration regulations (20 CFR 404.970 and 416.1470).  Under the authority CFR 404.977 and 416.1477, the Appeals Council vacates the hearing decision and remands this case to an Administrative Law Judge for resolution of the following issue:
>
> The Appeals Council received additional evidence.  This additional evidence is new, material, and relates to the period at issue.  There is a reasonable probability that the additional evidence would change the outcome of the decision.  The claimant showed good cause for why the evidence was not submitted earlier.  The additional evidence should be considered by the Administrative Law Judge on remand.
>
> • With the request for review, the claimant submitted new and material evidence, which shows a reasonable probability that it would change the outcome of the decision (20 CFR 404.970(a)(5) and 416.1470(a)(5)).  The

---

[2]    The Social Security Administrative Record ("R.") is available at Dkt. 10.

new evidence documents a hospitalization at St. Cloud Hospital for suicidal ideation and self-injurious behavior from January 30, 2016 through February 8, 2016. Although the claimant's psychiatric condition stabilized with treatment during her hospital stay, she was discharged to a partial hospitalization program on February 8, 2016, which indicates her symptoms were severe enough to require continued intensive treatment.

The new evidence is consistent with existing treatment notes from December 2015, which indicate the claimant was "very depressed" and had urges to engage in self-injurious behavior (Exhibit 21F, page 2). Furthermore, the claimant had a prior hospitalization for suicidal ideation and self-injurious behavior in August 2015, the circumstances of which were similar to the circumstances identified in the newly submitted 2016 hospital records (Exhibit 14F, page 7). Further consideration of the severity and effects of the claimant's mental impairments is necessary.

Upon remand the Administrative Law Judge will:

• Obtain additional evidence concerning the claimant's major depression, bipolar disorder, anxiety disorder, panic disorder, posttraumatic stress disorder, and autism spectrum disorder in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512 and 416.912).

(R. 212-14.)

On October 24, 2017, the ALJ held a second administrative hearing, with testimony from Plaintiff, a medical expert, and a vocational expert. (R. 92-129.) On November 24, 2017, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled through the date of the ALJ's decision. (R. 35-36.)

Following the five-step sequential evaluation process under 20 C.F.R. §

404.1520(a),[3] the ALJ first determined at step one that Plaintiff had not engaged in

substantial gainful activity since March 1, 2012.  (R. 20.)

At step two, the ALJ determined that Plaintiff had the following severe

impairments: major depression, bipolar disorder, anxiety disorder - not otherwise

specified ("NOS"), panic disorder with agoraphobia, post-traumatic stress disorder

("PTSD"), autism spectrum disorder, and borderline personality disorder.  (R. 20.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that

meets or medically equals the severity of one of the listed impairments in 20 C.F.R. part

404, subpart P, appendix 1.  (R. 23.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had

the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform a full range of
> work at all exertional levels but with the following nonexertional limitations:
> simple routine, repetitive 3-to-4 step tasks and instructions that are consistent

---

[3]    The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the
> claimant is presently engaged in a substantial gainful activity; (2) whether
> the claimant has a severe impairment that significantly limits the claimant's
> physical or mental ability to perform basic work activities; (3) whether the
> claimant has an impairment that meets or equals a presumptively disabling
> impairment listed in the regulations; (4) whether the claimant has the residual
> functional capacity to perform his or her past relevant work; and (5) if the
> claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that
> the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

with a specific vocational preparation of a 1 or a 2 as defined in the Dictionary of Occupational Titles, occasional brief and superficial contact with coworkers, supervisors and the public, however, these are tasks that can be performed independently meaning they would not require collaboration or teamwork with coworkers for completion and they would not require direct interaction with or serving the public for completion of the tasks.

(R. 28.)

The ALJ concluded that Plaintiff was unable to perform her past relevant work as personal care attendant ("PCA").  (R. 33.)

At the fifth step of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ found that through the date last insured, considering the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy including:  as a packager (DOT No. 920.587-018), laundry presser (DOT No. 363.684-018), or laundry worker (DOT No. 361.685-018).  (R. 34.)

Plaintiff requested review of the decision.  The Appeals Council denied Plaintiff's request for review without comment, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-4.)  Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    <u>RELEVANT RECORD</u>

On April 11, 2012, Plaintiff saw psychiatrist Dr. Carlos Schenck, M.D., who noted that been Plaintiff had been decompensating, as she did periodically during the year, making her unreliable at her position as a PCA, and that Plaintiff was seeking forms to cover her periods of illness-related work absences.  (R. 540.)  Her prominent symptoms involved anxiety, mood shifts, and depression.  (R. 540.)  Plaintiff was diagnosed with bipolar II disorder and was taking antidepressants.  (R. 540.)  The assessment was that Plaintiff had regressed.  (R. 540.)  Plaintiff's mental status exam was normal save for a depressed mood and a restricted affect.  (R. 542.)

On June 7, 2012, Plaintiff again saw Dr. Schnek, who noted that Plaintiff was unchanged from her previous appointment, and that she was still feeling depressed with low energy.  (R. 543.)  Dr. Schenck added Bupropion-XL to Plaintiff's medications in order to treat her depression.  (R. 543.)  Plaintiff was diagnosed with bipolar II disorder and was taking antidepressants.  (R. 543.)  Plaintiff's mental status exam was normal, save for a depressed mood and a restricted affect.  (R. 545.)

On July 27, 2012, Plaintiff had regressed and saw Dr. Schenck in order to change medications for her depression.  (R. 546.)  On August 24, 2012, Plaintiff and her mother confirmed Plaintiff's low level of functioning with low motivation over the previous six months.  (R. 549.)  Plaintiff and her mother discussed taking a drug holiday to reassess her baseline status, but Dr. Schenck advised against this because it would likely exacerbate her depression.  (R. 549.)  Dr. Schenck agreed to gradually decrease one of

her medications and noted that Plaintiff was not suicidal or psychotic during the appointment.  (R. 549.)

On December 28, 2012, Plaintiff reported that she was successfully able to taper two of her medications, but still had some mood instability.  (R. 552.)  The assessment of Plaintiff by Dr. Schenck was that she was stable and improved.  (R. 552.)  Plaintiff's mental health status exam, including her mood and affect, was normal.  (R. 554.)  It was noted that Plaintiff was close to her boyfriend and her parents, and that she was going to be starting cosmetology school.  (R. 552.)

On March 25, 2013, Plaintiff saw Dr. Schenck for a psychiatric follow-up.  (R. 555.)  Plaintiff reported having problems attending beauty school because of her anxiety and depression, and so Dr. Schenck wrote a note for her school explaining how she needed periodic absences from school and work because of her psychiatric disorders.  (R. 555.)  Plaintiff agreed to be on a trial for Prozac and she was encouraged to undergo a vocational counseling.  (R. 555-56.)  Her mental health assessment was normal, except that her mood was anxious and depressed, she was preoccupied, and her affect was restricted.  (R. 556.)

On May 16, 2013, Plaintiff saw Dr. Schenck for a psychiatric follow-up to manage her medications.  (R. 558-59.)  Plaintiff was assessed with bipolar disorder, chronic major depression, and anxiety disorder.  (R. 558.)  Plaintiff reported being more irritable and her medications were adjusted accordingly.  (R. 559.)  Her mental health assessment was largely normal except for anxiety, a depressed mood, and a restricted, although appropriate, affect.  (R. 559-60.)

On July 31. 2013, Plaintiff saw Dr. Schenck for a psychiatric follow-up. (R. 561.) Plaintiff reported that she lived with her boyfriend of two years and that they got along very well. (R. 562.) Plaintiff claimed that she remained quite dysfunctional from depression, stayed in her bed too much, had irregular sleep hours, and continued to have passive suicidal thoughts. (R. 561.) Plaintiff's mental status exam was normal save for a depressed mood and a restricted affect. (R. 562-63.)

On August 22, 2013, Clinical Therapist Jessica Bauman noted that Plaintiff had been diagnosed with anxiety, major depression disorder, mood disorder, with a past history of bipolar II, and obsessive-compulsive disorder. (R. 685.) The impact of this diagnosis was that she struggled with mood regulation, suffered from panic attacks with an increased need for isolation, and had difficulties with activities of daily living, schoolwork, and work attendance. (R. 685.)

On August 26, 2013, Plaintiff saw Dr. Schenck for a psychiatric follow-up. (R. 562.) Plaintiff was diagnosed with anxiety disorder, bipolar disorder, and chronic major depression. (R. 564.) Forms were supplied by Plaintiff for her social security disability application. (R. 564-65.)

On August 27, 2013, Dr. Schenck filled out a medical source statement of ability to do work-related activities for Plaintiff. Dr. Schenck found that Plaintiff's ability to understand, remember, and carry out instructions were not affected by her impairments. (R. 688.) Dr. Schenck also found that Plaintiff's ability to interact with others and to deal with changes in a routine work setting was affected by her impairments. (R. 689.) She had a marked restriction to her ability to interact appropriately with the public, interact

appropriately with co-workers, respond appropriately to usual work situations and changes in a routine work setting; and an extreme limitation to her ability to interact appropriately with supervisors. (R. 689.) Her attendance to work was also affected by her impairment. (R. 689.) Dr. Schenck based his opinions on Plaintiff's mental status at her appointments and from her family and history. (R. 689.)

Plaintiff saw Dr. Schenck again on September 18, 2013, and was assessed with panic disorder with agoraphobia and chronic major depression. (R. 566.) Plaintiff reported a worsening of symptoms, with recurrent panic attacks and agoraphobia. (R. 567.) Plaintiff's depression had also deepened, but she denied suicidality or psychotic or bipolar symptoms. (R. 567.) Plaintiff continued to live with her boyfriend. (R. 567.) Dr. Schenck increased Plaintiff's dosage of fluoxetine and switched her from lorazepam to clonazepam. (R. 567.) Plaintiff was tearful and quite distressed throughout the appointment. (R. 567.)

On October 17, 2013, Plaintiff reported to Dr. Schenck that she received no benefit from the clonazepam trial, as she could not sleep but had various side effects, and went back to lorazepam, which helped some of her ongoing anxiety but not her panic anxiety. (R. 570.) Plaintiff was still not sleeping at night. (R. 570.) Plaintiff's mental status exam was normal save for a depressed and anxious mood and a restricted affect. (R. 570.) Plaintiff was prescribed with alprazolam. (R. 570.)

Plaintiff saw Dr. Schenck again on December 11, 2013. (R. 572.) Plaintiff reported an excellent anti-anxiety response to alprazolam, without side effects. (R. 573.) Plaintiff had recently gotten engaged. (R. 573.) Overall, she was happier compared to

her prior visits.  (R. 573.)  She continued to have an adequate benefit from her other medications.  (R. 573.)  Plaintiff's mental status exam was normal.  (R. 574.)

Plaintiff next saw Dr. Schenck on February 11, 2014.  (R. 575.)  Plaintiff arrived late because a panic attack.  (R. 576.)  Plaintiff was seeing her therapist twice weekly because of her panic and agoraphobia disorder, and was experiencing PTSD with flashbacks of prior sexual abuse.  (R. 576.)  She was being referred for specialized therapy of this condition.  (R. 576.)  Plaintiff had been unable to sleep, given her hyperaroused state, and she was looking into having a companion dog.  (R. 576.)  She noted a hope that she could obtain social security benefits and was appealing being let go from school.  (R. 576.)  She and her fiancé continued to get along well.  (R. 576.)  Plaintiff's mental status exam was normal save for a depressed and anxious mood with a restricted affect and preoccupations.  (R. 577.)

On March 21, 2014, State Agency psychologist James M. Alsdurf, Ph.D., LP, opined on Plaintiff's mental capacity based on the available medical record.  (R. 135-37.)  As to Plaintiff's understating and memory limitations, Dr. Alsdurf opined that Plaintiff was not significantly limited as to her ability to remember locations and work-like procedures, and her ability to understand and remember very short and simple instructions; and was moderately limited as to her ability to understand and remember detailed instructions.  (R. 135.)  As to Plaintiff's sustained concentration and persistence limitations, Dr. Alsdurf opined that Plaintiff was not significantly limited as to her ability to carry out very short and simple instructions; her ability to maintain attention and concentration for extended periods; her ability to sustain an ordinary routine without

special supervision; or her ability to make simple work-related decisions. (R. 135-36.) Dr. Alsdurf opined that Plaintiff was moderately limited as to her ability to carry out detailed instructions, her ability to perform activities within a schedule, maintain regular attendance, and be punctual; her ability to work in coordination with or in proximity to others without being distracted by them; and as to her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 135-36.) As to Plaintiff's social interaction limitations, Dr. Alsdurf opined that Plaintiff was not significantly limited as to her ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 136.) Dr. Alsdurf opined that Plaintiff was moderately limited as to her ability to interact appropriately with the general public. (R. 136.) Plaintiff's adaptive limitations were not significantly limited, except for her ability to respond appropriately to changes in the work setting, which Dr. Alsdurf opined was moderately limited. (R. 136.) Dr. Alsdurf assessed Plaintiff with the following RFC:

> Claimant's ability to carry out routine repetitive 3-4 step, and limited detailed tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex/technical tasks. Ability to deal with co-workers and the public would be somewhat restricted. It would be adequate for superficial contact, but not sustained close contact. Claimant's ability to handle supervision would not be significantly limited. Claimant's ability to handle stress and pressure in the work place would be somewhat reduced. It would be adequate to tolerate the routine stresses of a

11

routine repetitive, a 3-4 step, or a limited detail work setting, but not adequate
for the stresses of a multi-detailed or complex work setting.

(R. 136-37.)

On April 3, 2014, Plaintiff saw Dr. Schenck for a medication management visit.

(R. 675.)  Plaintiff was suffering from depression, and her medications were increased.

(R. 675.)

On April 24, 2014, Plaintiff had an appointment with her general medical

provider, during which she had a number of complaints, none of which concerned her

mental health.  (R. 607-08.)  Plaintiff reported no insomnia, she was not in any distress,

and showed an appropriate affect.  (R. 607-08.)

On June 26, 2014, Plaintiff noted to Dr. Schenck that her "better days" were

getting better, but her "worse days" were getting worse, with major negative anergia and

thoughts of self-cutting her forearm (as she last did 10 months prior, without any medical

consequence).  (R. 671.)  Plaintiff was prescribed with methylphenidate to control her

depressive thoughts.  (R. 671, 673.)  Plaintiff's mental status exam was normal save for a

depressed and anxious mood and a restricted affect with preoccupations.  (R. 672.)

On September 25, 2014, Plaintiff saw Dr. Schenck, who assessed her with major

depression, recurrent, chronic PTSD, bipolar affective disorder; and panic disorder with

agoraphobia.  (R. 666.)  Plaintiff reported feeling somewhat better, in part because she

had a part-time job and she and her fiancé continued to get along.  (R. 667.)  She reported

a benefit from methylphenidate but it caused her to "crash" so she was switched to the

longer lasting Concerta.  (R. 667.)  Her mental health status exam was normal, save for her mood and her restricted affect with preoccupations.  (R. 668.)

On October 10, 2014, State Agency psychologist Mary Sullivan, Ph.D., opined on Plaintiff's mental capacity based on the available medical record.  (R. 162-64.)  As to Plaintiff's understating and memory limitations, Dr. Sullivan opined that Plaintiff was not significantly limited as to her ability to remember locations and work-like procedures and understand and remember very short and simple instructions, and was moderately limited as to her ability to understand and remember detailed instructions.  (R. 162.)  As to Plaintiff's sustained concentration and persistence limitations, Dr. Sullivan opined that Plaintiff was not significantly limited as to her ability to carry out very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; or make simple work-related decisions.  (R. 162.)  Dr. Sullivan opined that Plaintiff was moderately limited as to her ability to carry out detailed instructions, to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, be punctual; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 162.)  As to Plaintiff's social interaction limitations, Dr. Sullivan opined that Plaintiff was not significantly limited as to her ability to ask simple questions or request assistance, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting

behavioral extremes, or as to her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 163.) Plaintiff's adaptive limitations were not significantly limited, except for her ability to respond appropriately to changes in the work setting, which Dr. Sullivan opined was moderately limited. (R. 163.) Dr. Sullivan assessed Plaintiff with the following RFC:

> Claimant retains sufficient mental capacity to concentrate on, understand, and remember routine, repetitive 3-4 step and limited-detailed instructions, but would be markedly limited for multi-detailed or complex /technical instructions. Claimant's ability to carry out routine repetitive 3-4 step, and limited detailed tasks with adequate persistence and pace would not be significantly limited, but would be markedly limited for detailed or complex /technical tasks. Ability to deal with co-workers and the public would be somewhat restricted. It would be adequate for superficial contact, but not sustained close contact. Claimant's ability to handle supervision would not be significantly limited. Claimant's ability to handle stress and pressure in the work place would be somewhat reduced. It would be adequate to tolerate the routine stresses of a routine repetitive, a 3-4 step, or a limited detail work setting, but not adequate for the stresses of a multi-detailed or complex work setting.

(R. 163.) Dr. Sullivan's rationale for her RFC was Plaintiff's representation at her September 24, 2019 re-check that she was doing well, she was working as a part-time PCA, and getting along with her fiancé. (R. 164.) Dr. Sullivan noted that Plaintiff's mental status exam during that appointment was positive for an anxious and depressed mood, but otherwise normal. (R. 164.)

On November 24, 2014, Plaintiff reported to Dr. Schenck that she was doing well and that the Concerta medication was helping her stay awake, although she needed a higher dosage to last through the day. (R. 774.) Dr. Schnek noted that her other medication therapies continued to be effective. (R. 774.) Plaintiff noted that she would

be starting cosmetology school in St. Cloud.  (R. 774.)  Her mental health exam was normal save for preoccupations.  (R. 774-75.)

On December 31, 2014, Plaintiff reported to Dr. Schenck that she was more stressed out because she did not have a car.  (R. 770.)  She was scheduled to have gastric bypass surgery in March and would be living with her parents during this procedure while her husband was in St. Cloud.  (R. 770.)  Her mental health status exam was normal save for her being anxious with preoccupations.  (R. 771-72.)

Plaintiff had a psychiatric follow-up with Dr. Schenck on February 27, 2015.  (R. 765.)  Plaintiff reported that she had quit working a month earlier because it was too stressful.  (R. 766.)  Plaintiff was assessed with bipolar affective disorder, hypersomnia, major depression, panic disorder with agoraphobia and PTSD.  (R. 765.)  Plaintiff described becoming more moody and depressed, so her oxcarbazepine medication dosage was increased in order to stabilize her mood.  (R. 766.)  Her mental health status exam was normal save for her mood and her restricted affect with preoccupations.  (R. 768.)

On March 6, 2015, Plaintiff was seen for shortness of breath that was due to her weight and anxiety.  (R. 723-24.)

On March 18, 2015, Plaintiff had another appointment with Dr. Schenck.  (R. 760.)  She reported that a medication trial was not successful as it was overstimulating and made her "scatterbrained."  (R. 761.)  She needed a new medication for her depression because she was crying over things that normally did not make her cry.  (R. 761.)  She also wanted an antidepressant that would not cause her to gain weight.  (R. 761.)  She did not feel as though her mood had stabilized with an increased dose of a

different medication. (R. 761.) Plaintiff's mental status exam was normal except for an anxious and depressed mood, with a restricted affect and preoccupations. (R. 763.)

On April 10, 2015, Plaintiff saw Dr. Schenck who assessed her with bipolar affective disorder, PTSD, major depression, hypersomnia, and panic disorder with agoraphobia. (R. 755.) Plaintiff came in for an urgent appointment with Dr. Schenck because of increasing depression. (R. 756.) She had thoughts of self-harm involving cutting her arm, but denied having a strong impulse to carry out on those thoughts. (R. 756.) She appeared dysphoric and depressed, but was in control, and Plaintiff expressed optimism that a new medication would help with her mood. (R. 756.) Plaintiff's mental status exam was normal except for an anxious and depressed mood with a restricted affect and preoccupations. (R. 758.)

On June 16, 2015, Plaintiff was interviewed by Therapist Bauman during which Plaintiff professed increasing depression and anxiety. (R. 739.) Her relationship with her partner was stable. (R. 739.) Plaintiff was cooperative, attentive, and a good historian during the interview. (R. 740.) Her personal hygiene was fair, and her dress was casual. (R. 740.) Plaintiff's mental exam was normal across all categories, except that she was in distress with anxiety and depression, and her judgment was moderately impaired. (R. 740-41.) Plaintiff was diagnosed with bipolar disorder unspecified (per history), a rule-out diagnosis for PTSD, and unspecified anxiety disorder with a GAF of 40. (R. 742-43.) Plaintiff's prognosis was unknown due to her moving out of the area and her sporadic treatment with Therapist Bauman. (R. 743.) It was recommended that she seek more intensive services in the St. Cloud area. (R. 743.)

On August 29, 2015, Plaintiff presented to the St. Cloud Hospital emergency trauma center with depression and thoughts of suicide. (R. 734.) Earlier in the day she had made superficial cuts of her lower leg with a razor. (R. 734.) Dressing had been applied and no further repair was necessary. (R. 734.) She had done nothing else to harm herself. (R. 734.) It was noted that Plaintiff had a previous suicide attempt in 2009. (R. 734.) Plaintiff indicated that she would not harm herself because it would hurt the people around her and felt as though she could be safe. (R. 734.) Her preference was not to be in the hospital, but she also claimed that when she gets like this, sometimes she will "dissociate" and may not be able to control her behavior. (R. 734.) She further stated that the last time she was admitted, she actually felt that it did more harm than good. (R. 734.) Plaintiff was alert and appeared comfortable. (R. 735.) She was noted as cooperative. (R. 735.) She was seen by Behavioral Access and it was not felt that she met criteria for admission. (R. 735.) It was determined that the crisis bed would be a good option for her. (R. 735.) Her husband did not feel completely comfortable having her home at this point. (R. 735.)

On September 2, 2015, Plaintiff had a psychiatric appointment with Dr. Schenck. (R. 750.) Plaintiff asserted that during the previous week that a man had grabbed her arm and made threating comments to her with sexual overtones. (R. 750.) Plaintiff noted that she had made cuts to her right leg and regretted not making them deeper so that they would have required stiches. (R. 750.) She had been admitted to a crisis home where she remained, and that specialized therapy was being set up for her. (R. 750.) Plaintiff was started on a Viibryd anti-depressant trial. (R. 750.) Plaintiff's mental status exam was

normal save for her depressed and anxious mood, as well as her a restricted affect.  (R.

752.)  The plan was for Plaintiff to continue to live at the crisis home.  (R. 752.)

On September 14, 2015, Plaintiff had a diagnostic assessment for outpatient

mental health services because of her use of a crisis bed for over a week.  (R. 692, 694.)

Plaintiff reported symptoms of depression and anxiety.  (R. 693.)  She also endorsed

significant trauma, reported self-injurious behavior, suicidal thoughts, as well as panic

attacks, which reportedly occurred 2 to 3 times per week.  (R. 693.)  It was noted that

Plaintiff had recently utilized crisis services including using a crisis bed for a week

during a mental health emergency, and would benefit from continuing individual therapy.

(R. 693, 696.)  Plaintiff reported being denied social security benefits and her inability to

attend cosmetology school due to her increased mental health symptoms.  (R. 693.)  She

reportedly isolated herself, but felt supported by her husband and parents.  (R. 693.)

Plaintiff also reported difficulty with grooming/hygiene, handling money, socializing,

exercising, eating healthy, getting sleep, taking care of her home, enjoying/using free-

time, receiving regular medical/dental care, and accomplishing goals.  (R. 693.)

Plaintiff's financial needs were supported by her husband.  (R. 693.)  According to the

assessment, Plaintiff was last hospitalized in 2009 after a suicide attempt.  (R. 694.)

Plaintiff was diagnosed with major depressive disorder, recurrent, severe with panic

attacks.  (R. 695.)  The recommended services included the following:

> It is recommended that client establish individual therapy with this clinician
> or another provider.  Plan may include psycho-education, teaching coping
> skills, CBT, and DBT skills.  It is recommended client continue working with
> her psychiatrist for medication management.  Client would also benefit from
> a psychological evaluation to further rule out other diagnosis and ensure

client receives appropriate treatment. Client may additionally benefit from community outreach services including ARMHS, Day Treatment, and/or Targeted Case Management and referrals will be made as needed and/or requested. Client[']s symptoms will likely increase in intensity and duration, possibly requiring a higher level of care if services are not provided.

(R. 696.)

On October 28, 2015, Plaintiff was evaluated for autism. (R. 778.) Plaintiff noted that she struggled when overstimulated causing her to shake and needing to leave an environment at times. (R. 778.) She also reported being hyperfocused, which caused her to be easily startled. (R. 778.) Her husband reported that she struggled with social cues and would become anxious if her schedule changed. (R. 778.) Plaintiff noted that she worked so hard to support others that she did not recognize that she needed help as well. (R. 782.) She had a history of making others feel stupid, did not like engaging in small talk, expressed sensory issues with texture, and had difficulty maintaining employment because she needs tasks and expectations explicitly stated. (R. 783.) As part of her evaluation, Plaintiff took the Wechsler Adult Intelligence Scale assessment, which showed that her intellectual level fell within the normal range. (R. 785.) She also tested within the normal range of the Vineland Adaptive Behaviors Scales I in the areas of communication, daily living scales, socialization, and adaptive behavior. (R. 786.) The generalized Anxiety Disorder screener indicated that Plaintiff suffered from severe depression. (R. 787-88.) Plaintiff's World Health Organization Disability Assessment Schedule 2.0 score indicated that she had an overall need in the range of severe, with the highest need levels relating to her emotional adjustment, her ability to manage daily tasks, dealing with others, and maintaining relationships on a daily basis. (R. 788.) Her

autism screening was positive for an Autism Spectrum Disorder. (R. 787-88.) It was noted that Plaintiff would need to be specifically taught skills that others learn naturally from their experience and their environment; and she would benefit from support to help to build her adaptive skills. (R. 788.) Further, Plaintiff's significantly delayed skills indicated the need for high structure and support in order to maintain independence and safety and that she may benefit from target case management services. (R. 790.)

On December 16, 2015, Dr. Schenck filled out a Medical Source Statement of Ability to do Work-Related Activities (Mental). (R. 804-05.) Dr. Schenck found Plaintiff's ability to understand, remember, and carry out instructions were not affected by her impairments. (R. 804.) Dr. Schenck also found that Plaintiff's ability to interact with others and to deal with changes in a routine work setting was affected by her impairments. (R. 805.) Dr. Schenck opined that Plaintiff had marked restrictions to her ability to interact appropriately with the public, interact appropriately with co-workers, interact appropriately with supervisors, and respond appropriately to changes in a routine work settling; and an extreme limitation to her ability to respond appropriately to work pressures in a routine work setting. (R. 805.) Dr. Schenck based his opinions on Plaintiff's severe, chronic, and relentless bipolar disorder, panic disorder/agoraphobia, major depression, and hypersomnia. (R. 805.)

On December 16, 2015, Plaintiff saw Dr. Schenck for a psychiatric follow-up. (R. 807.) Plaintiff was being treated for bipolar disorder, panic disorder/agoraphobia, major depression, and hypersomnia. (R. 807.) Plaintiff continued to be very depressed, and while not suicidal, she had urges to cut herself, and so she attempted to compensate by

20

having small barbells placed into her tongue.  (R. 807.)  Plaintiff's mental health exam

showed she was anxious and depressed with a restricted affect and slow speech, she was

cooperative but apathetic, and was preoccupied with her mental health.  (R. 809.)

Otherwise, Plaintiff's exam showed that she was orientated with normal eye contact, her

thought content was logical, goal oriented, she had no suicidal or homicidal ideations,

and displayed an intact memory and focused concentration.  (R. 809.)  Plaintiff was told

to return in six weeks or if symptoms otherwise changed.  (R. 809.)

On December 17, 2015, Plaintiff saw Therapist Bauer for a psychotherapy session.

(R. 864.)  Plaintiff was nervous about a mouse in her house and was anxious because they

carried disease.  (R. 864.)

On December 28, 2015, Plaintiff reported to Therapist Bauer that she was on her

way to a breakdown and it was noted that she appeared nervous.  (R. 865.)

On January 30, 2016, Plaintiff presented to the St. Cloud Hospital due to suicidal

ideation and behaviors.  (R. 821.)  Plaintiff took too many of her medications the

previous day and within 24 hours she proceeded to cut herself four times.  (R. 821.)

Plaintiff hoped that cutting herself would relieve the bad feelings in her brain.  (R. 821.)

Plaintiff claimed that she had bipolar diagnosis which was resistant to medications.  (R.

821.)  Her affect was blunted, she denied any memory problems, she was calm with fair

judgment, and her thought processes were logical and organized.  (R. 823.)  Plaintiff felt

like she was at risk at home and was agreeable to voluntary admission.  (R. 823.)  She

was placed on suicide precautions with close observation every 15 minutes.  (R. 820.)

Plaintiff was to be discharged to a partial hospitalization program once she was stable

enough, which she expressed a willingness to do.  (R. 820.)  During a mental status examination, Plaintiff did not appear in acute distress, she maintained good contact, her mood was depressed, her affect was slightly restricted, speech and thought were normal, she had no flight of ideas, she expressed suicidal ideations without an active plan or intent and no homicidal ideations, her affect was slightly restricted, attention and concentration were fair, she had fair insight, and good judgment.  (R. 819.)  Plaintiff's medical records were reviewed, including her last hospitalization in 2015 for the same event where she was discharged to a crisis bed.  (R. 817.)  It was reported that Plaintiff told a nurse that she did not care whether she lived or died.  (R. 817.)  Plaintiff was discharged on February 8, 2016 after showing an improvement due to a change in medication regimen and therapy.  (R. 812.)  She was going to follow-up with a partial hospitalization program and her psychiatrist.  (R. 812.)

On February 22, 2016, Plaintiff reported that her discharge from the partial program was planned for some time the following week. (R. 846.)  It is unclear when Plaintiff was actually discharged from the partial hospitalization program.

On March 21, 2016, Plaintiff reported her hospitalization to Therapist Bauer and her subsequent partial hospitalization.  (R. 866.)  She reported having injurious thoughts with an intent to harm herself.  (R. 866.)

On March 24, 2016, Plaintiff reported that she had spoken with a school, and she would be starting the following month.  (R. 848.)

On April 4, 2016, Plaintiff reported to Therapist Bauer that she was having conflicted feelings about her marriage but reported no suicidal thinking.  (R. 868.)

22

On May 4, 2016, Plaintiff reported to Therapist Bauer that she was dropping out of school. (R. 869.) Plaintiff appeared unkempt with moderate hygiene. (R. 869.) Her affect was flat, and her mood was dysthymic. (R. 869.) She also reported suicidal ideation with no plan or intent. (R. 869.)

On May 6, 2016, Plaintiff saw Dr. Schenck for her anxiety, depression and thoughts of suicide, and hypersomnia. (R. 919.) Plaintiff reported that since her previous appointment five months earlier, she had a psychiatric hospitalization and thereafter underwent a partial hospitalization program after she had become more depressed and cut her leg. (R. 919.) It was noted that while in the hospital, her diagnosis was switched from bipolar to borderline personality disorder. (R. 919.) Her medication had been modified, but it was not helping her with her anxiety. (R. 919.) She continued to be very depressed despite her large dosage of fluoxetine, and while not suicidal, she had urges to cut herself. (R. 919.) Plaintiff was very dysfunctional from her severe ongoing major depression, multimodal anxiety symptoms (PTSD, general anxiety, and panic anxiety), and could not do much housework. (R. 919.) Dr. Schenck found that Plaintiff's speech was slow, she was apathetic, her mood was depressed, she had a restricted affect, and was preoccupied. (R. 921.)

On May 11, 2016, Plaintiff again reported trouble with her marriage. (R. 870.) She reported a "low mood" and displayed a flat affect. (R. 870.) Plaintiff denied any suicidal ideation or recent self-injury. (R. 870.)

On May 18, 2016, Plaintiff noted to Therapist Bauer that she had a very low mood, but she denied any suicidal ideation, although she mentioned that she felt like giving up.  (R. 871.)

On June 8, 2016, Plaintiff was evaluated by Therapist Bauer.  She was diagnosed with severe major depressive disorder with panic attacks, and PTSD.  (R. 861.)  Plaintiff claimed to have suicidal ideations almost every day for the previous two weeks.  (R. 861-62.)  Plaintiff's depression had also become worse in the last two weeks.  (R. 862.)  It was recommended that Plaintiff continue with weekly therapy sessions and continue with her psychiatrist for medication management.  (R. 862.)

On June 9, 2016, Plaintiff had another therapy session with Therapist Bauer.  (R. 872.)  Plaintiff appeared unkept with minimal care for grooming or hygiene.  (R. 872.)  Her affect was flat with a low mood.  (R. 872.)  Plaintiff reported having thoughts of self-harm but identified how she coped with these thoughts and avoided cutting.  (R. 872.)  She denied any suicidal thoughts.  (R. 872.)

On June 16, 2016, Plaintiff reported that her husband claimed he had an obsessive-compulsive disorder that focused on violence towards women, and Plaintiff worried because he had a temper.  (R. 873.)  Plaintiff presented with a flat affect and was quite sullen.  (R. 873.)

On July 1, 2016, Plaintiff was admitted through the emergency room at the St. Cloud Hospital.  (R. 924, 932, 935.)  Plaintiff presented to the emergency room for evaluation of suicidal ideation.  (R. 932.)  For approximately the past week to week and a half, Plaintiff had increased feelings of wanting to harm herself.  (R. 932.)  Plaintiff

stated she wanted to cut her leg down to the bone but denied any cutting.  (R. 932.)  She exhibited normal behavior with a flat affect.  (R. 934.)  Plaintiff noted trying outpatient supports, but reported that they were not successful and claimed that she did not feel safe at home.  (R. 928.)

On July 2, 2016, Plaintiff reported her depression symptoms included low mood, feelings of hopelessness, low energy, anhedonia, poor concentration, variable appetite, and some increase in sleep.  (R. 928.)  She also reported generalized worry and anxiety that was severe enough to impair focus and task completion, and that she had spikes of anxiety with panic attacks several times a day.  (R. 928.)  Plaintiff reported that she had started dialectical behavior therapy two weeks earlier.  (R. 928.)  It was noted that this had been Plaintiff's third psychiatric hospitalization, including the hospitalization in February 2016 and the other several years ago.  (R. 929.)  Her mental health examination was normal save for her depressed and anxious mood, and strong urges for self-harm and also suicidal ideation with no plans or intent.  (R. 931.)  The diagnosis for Plaintiff was mood disorder, rule out major depression vs bipolar disorder, panic disorder, and borderline personality disorder.  (R. 931.)  The plan for Plaintiff was to continue with outpatient medication and encourage Plaintiff to participate in group activities.  (R. 931.)

Plaintiff was discharged from the hospital on July 14, 2016.  (R. 925.)  Plaintiff was involved with a variety of therapies during her hospitalization.  (R. 925.)  She was initiated on BuSpar, which was increased to 15 mg twice daily. (R. 925.)  Plaintiff also started on Vistaril 25 mg every 4 hours as needed for anxiety and melatonin 3 mg at bedtime. (R. 925.)  Her other psychotropics of Abilify, Prozac, Trileptal and trazodone

were unchanged.  (R. 925.)  It was noted that she was under a lot of stress because her husband wanted a separation.  (R. 925.)  She noted chronic suicidal thoughts, and that these were unchanged, but claimed that she felt very much in control of them and did not believe that she would act out upon them.  (R. 925.)  She felt that she was stable for discharge to her parents.  (R. 925.)  Plaintiff's discharge mental examination was normal. (R. 925.)

On July 27, 2016, Plaintiff reported to Therapist Bauer that she was staying with her parents due to conflict with her husband.  (R. 875.)  She claimed suicidal ideations with no plan or intent to carryout suicide.  (R. 875.)

On August 5, 2016, Plaintiff had a follow-up psychiatric appointment with Dr. Schenck for her anxiety, depression, and thoughts of suicide.  (R. 915.)  It was noted that she had been hospitalized for 13 days in July 2016 on account of suicidal and bodily harm ideations.  (R. 915.)  Plaintiff had started to take group dialectical behavior therapy classes that met every week for two hours.  (R. 915.)  Plaintiff continued to feel moderately depressed, but not suicidal, with minimal urges to engage in self-harm.  (R. 915.)

On August 10, 2016, Plaintiff reported to Therapist Bauer she had engaged in cutting while staying with her parents but denied any thoughts of suicide.  (R. 876.)

On December 2, 2016, Plaintiff saw Therapist Bauer for therapy during which she claimed that she had recently stopped working a job she had recently got because it was too stressful.  (R. 877.)  Plaintiff had strong urges to cut but was able to keep herself safe. (R. 877.)

On December 7, 2016, Plaintiff reported that she was staying at her parents in order to stay safe. (R. 878.) She professed a desire to work and would be starting by obtaining applications. (R. 878.) Plaintiff wanted to be firm about only working part-time until she became comfortable in her new job, and then would take on additional hours. (R. 878.) Plaintiff professed to having thoughts about cutting. (R. 878.)

On December 9, 2016, Plaintiff had a follow-up psychiatric appointment with Dr. Schenck. (R. 910.) Plaintiff reported feeling more depressed despite high doses of fluoxetine and Abilify, so she was instructed to increase her level of abilify. (R. 910.) She continued to have urges to self-cut, which were to be addressed by her therapy. (R. 910.) Plaintiff's PTSD, generalized anxiety disorder, panic anxiety, and borderline personality disorder remained at baseline levels. (R. 910.) Dr. Schenck found that Plaintiff's speech was slow, she was apathetic, her mood was depressed and anxious, she had a restricted affect, and exhibited preoccupations. (R. 912.)

On January 2, 2017, Plaintiff was seen in the emergency room as the result of falling on the ice. (R. 947.) A review of her psychological systems found that she had a normal mood and affect and that her behavior was normal. (R. 950.)

On March 7, 2017, Plaintiff reported to therapist JonPaul Dufour, M.S., that she had two job offers. (R. 884.) She noted that she had gotten into a fight with her husband because he called her beautiful, and in the past he had told her he found her physically unattractive. (R. 884.) Plaintiff noted no urges to harm herself. (R. 884.)

On April 15, 2017, Plaintiff was seen at the St. Cloud Hospital emergency room with representations that her depression had been getting worse over the previous couple

weeks, that she had some suicidal thoughts and thoughts about taking her pills or cutting herself, but denied any recent attempts, and claimed that she had not taken her medications that day because she was concerned that she would overdose.  (R. 953.)  Her mental health exam noted that Plaintiff had a flat mood with poor insight and poor reactivity.  (R. 955.)  Behavioral Access evaluated Plaintiff.  (R. 957.)  Plaintiff contracted for safety and stated that she did not want to kill herself.  (R. 957.)  Plaintiff was then discharged.  (R. 957.)  The hospital made a referral for Plaintiff to the adult partial hospitalization program.  (R. 957.)  Plaintiff was told to return if she had worsening symptoms.  (R. 957.)

On May 1, 2017, Plaintiff had a follow-up psychiatric appointment with Dr. Schenck regarding her depression, bipolar disorder, insomnia, and suicidal ideations.  (R. 905.)  Plaintiff reported that she went back to St. Cloud to resume living with her husband, but then started having suicidal thoughts of killing herself by medication overdose (although she never attempted it).  (R. 905.)  She had no current urges to harm herself.  (R. 905.)  Plaintiff went to the hospital for admission, but there were no beds available, and so she went back to live with her parents and her mother was dispensing her medications.  (R. 905.)  Plaintiff felt more depressed despite her high dose of fluoxetine, 80 mg and Abilify 5 mg daily, and so Dr. Schenck increased the dosage of the Abilify.  (R. 905.)  Plaintiff requested to enter the Day Treatment program at the Nystrom Coon Rapids clinic, and so Dr. Schenck made the referral.  (R. 905.)  Dr. Schenck found that Plaintiff's speech was slow, she was apathetic, her mood was depressed, she had a restricted affect, and displayed preoccupations with her mental health.  (R. 907.)

On May 31, 2017, Plaintiff had another follow-up psychiatric appointment with Dr. Schenck related to her depression, bipolar disorder, insomnia, and suicidal ideations. (R. 900.) Plaintiff reported doing better as she had moved back with her husband in order to improve their marriage. (R. 900.) The medication changes that were initiated at the previous appointment (starting imipramine and reducing the fluoxetine dose) had worked well in alleviating a substantial amount of Plaintiff's depression. (R. 900.) She was sleeping well with the use of trazodone and had no urges to harm herself. (R. 900.) PTSD, generalized anxiety, panic anxiety, and borderline personality disorder remained at baseline levels. (R. 900.) Plaintiff represented that she would be starting group therapy while continuing her individual therapy. (R. 900.) She appeared fully alert and was non-depressed. (R. 900.) Her mental status exam was normal. (R. 902.)

On July 1, 2017, she reported to the emergency room with abdominal pain. (R. 963.) The review of her psychological systems showed that Plaintiff had a normal mood and affect, and that her behavior was normal. (R. 966.)

On August 22, 2017, Plaintiff reported that she and her husband temporarily separated, but had gotten back together and were trying to make things work. (R. 885.) Plaintiff had started working at a foster home. (R. 885.)

On August 29, 2017 and September 5, 2017, Plaintiff reported that her relationship with her husband was deteriorating because of his desire to have a polyamorous marriage. (R. 886, 890.) Plaintiff reported thoughts of self-harm with no plans to act out on those thoughts. (R. 886, 890.)

At her September 21, 2017 appointment, Plaintiff continued to discuss the separation with her husband, but appeared to have confidence and smiled during the appointment.  (R. 889.)  Plaintiff had suicidal thoughts.  (R. 889.)

On September 26, 2017. Plaintiff reported to her therapist that she was living with her parents because she had separated from her husband.  (R. 888.)  Plaintiff claimed that her husband was emotionally abusive and that he may have been the cause of her depressive episodes.  (R. 888.)  Plaintiff had been finding comfort from friends she was reconnecting with, people her husband would not allow her to see.  (R. 888.)  Plaintiff stated she could keep herself safe at this time even with her nighttime thoughts of suicide and self-harm.  (R. 888.)

On September 29, 2017, Plaintiff saw Dr. Schenck in order to fill out forms for her social security appeal and to discuss her clinical status.  (R. 895.)  Plaintiff's husband had terminated their marriage, stating that he could no longer tolerate Plaintiff's sadness.  (R. 895.)  Plaintiff was living with her parents.  (R. 895.)  Her depression had deepened.  (R. 895.)  Plaintiff reported a mild trazodone overdose, but was not hospitalized.  (R. 895.)  Plaintiff's mother was managing her medications.  (R. 895.)  After discussion it was agreed to increase the dose of Plaintiff's desipramine depression medication.  (R. 895.)  The mental status examination showed that she had a depressed mood and restricted affect with preoccupations, but was otherwise normal.  (R. 897.)

On September 29, 2017, Dr. Schenck filled out a new Medical Source Statement of Ability to do Work-Related Activities (Mental).  (R. 892-93.)  Dr. Schenck found Plaintiff's ability to understand, remember, and carry out instructions were not affected

by her impairments.  (R. 892.)  Dr. Schenck also found that Plaintiff's ability to interact

with others  and to deal with changes in routine work setting was affected by her

impairments.  (R. 893.)  Dr. Schenck opined that Plaintiff had a marked limitation to her

ability to interact appropriately with co-workers.  (R. 893.)  Dr. Schenck also opined that

Plaintiff had a marked to extreme restriction to her ability to interact appropriately with

the public, interact appropriately with supervisors, and respond appropriately to changes

in a routine work setting.  (R. 893.)  Finally, Dr. Schenck noted an extreme limitation to

Plaintiff's ability to respond appropriately to work pressures in a usual setting.  (R. 893.)

Dr. Schenck based his opinions on Plaintiff's severe and chronic PTSD, panic disorder,

generalized anxiety disorder, agoraphobia, major depression with recurrent suicidality,

and hypersomnia.  (R. 893.)  Dr. Schenck also relied upon her PQH-9 score of 23 in

support of his opinion.  (R. 893.)

**B.    Testimony of the Medical Expert**

During the October 24, 2017 hearing, the ALJ noted that the parties were back

before her for the following reasons:

> ALJ: Thank you, Mr. Tracy.  And as you might recall, I am Judge Kuhn.  We
> did meet once before.  And your case is back before me in light of some
> additional evidence that Mr. Tracy had submitted when he appealed to the
> appeals counsel, that's specifically, a hospitalization shortly when I issued
> my decision before.  And of course, the appeals counsel took a look at it and
> thought it might impact my analysis for the time period.  And so, of course,
> they sent it back and asked for me to take a look at it and see how it impacts
> your case with respect to the overall other evidence of record.  And so, that's
> what brings us here today.

(R. 94-95.)  The ALJ did not mention Plaintiff's partial hospitalization.  With respect to

Plaintiff's functional limitations, the ME testified as follows:

A[:] I understand there are no limitations there.  In the medical record at exhibit 1F, page 30, the claimant is reported to be logical and goal-directed although they do note some preoccupation, recent and remote memory noted to be intact.  1F, 46, again, recent, and remote memory were recorded as intact, 17F, 4, recent and remote memory were reported as intact.  In a test capacity on the WISC-V, the claimant had a verbal comprehension index of 116 in the high average range, perceptual reasoning index of 105 in the average range, working memory score of 95 in the average range, processing speed score of 94 in the average range with a full-scale IQ of 105, also in the average range.  Also, 22F, 9 just said her memory was grossly intact and her language skills good.  Your honor, I said the claimant's ability to interact with others was moderately impaired.  At 1F, 49 they note increased irritability. 1BF, 2 they noted the claimant struggled on reading social cues, that she often assumed others did not like her.  22F, B, there it said historically it said in school she had said she was a popular kid and had a number of friends.  24F, 7 said anxiety and agoraphobia made it harder for her to get out in the community and she spent most of her free time at home, at that juncture with her husband.  25F, 2, they said she was finding comfort reconnecting with people subsequent to her separation from her husband.  And at 18F, page 9, in [INAUDIBLE] Vineland Adaptive Behavior Scales second edition, claimant had a socialization score of 95, which was average.  I said moderately impaired, your honor, due to irritability, which is noted to be episodic, and some difficulty they attribute to reading of social cues.  I said the claimant's ability, your honor, to understand, remember, and apply, and – her ability to concentrate, maintain persistence and pace was moderately impaired.    At 1F, 32, 1F, 46 as-examples, attention and concentration are reported to be focused.  17F, 4, they again note attention and concentration to be focused.  22, F9, they said her attention and concentration was just fair. 24F, 55 they note the claimant to be looking for work, that she had applied for two jobs, had received two offers.  24F, 56 said she was working on a part-time basis and enjoying that work.  At 18F she had a working memory score of 95 and a processing speed score of 94; both of those, your honor, in the average range.  Your honor, in terms of adapting and managing herself I said, your honor, that was marked.  The claimant at 1F, 66, there they note she was 11 minutes late to her therapy appointment, and they said that was due to panic and difficulty leaving her apartment.  Subsequent to that, they said she would be seeing the therapist two times a week secondary to the panic and agoraphobia.  At 14F, 7 they note suicidal ideation and said the claimant had used a razor to make a long superficial cut on her lower right leg.  They said that the wound was dressed, no further attention required.  At 18F, 2 they noted increased anxiety with changes to routine or schedule.  And then I noticed a note, your honor, at 22F, 2, the claimant was hospitalized January 30th through February 8th of

2016 with increased depression and suicidal ideation. Exhibit 28F, claimant was hospitalized again, your honor, 7/1 through 7/14 of 2016 with depression and suicidal ideation. And then at 28F, 21 the claimant had an ER visit for alcohol intoxication but was stabilized and discharged from the ER that same day.

\* \* \*

Q[:] So, with respect to supported work-related functional limitations, what is reflected?

A[:] Your honor, I said work that would be unskilled through semi-skilled work with brief and superficial contact with others.

Q[:] And specifically for "others", is that public, coworkers, and supervisors?

A[:] Yes, your honor.

Q[:] Okay, all right. And with respect to the work-related functional limitations that you've articulated, which of these specifically are a manifestation of your conclusion of marked, and adapt or manage oneself?

A[:] Well, both, your honor, in terms of limiting the complexity of the work and the amount of interpersonal contact.

Q[:] Okay and is this -- in terms of the marked and adapt or managed, you had commented about panic and agoraphobia perhaps at times making her unable to leave her home, and increased stress and things of that nature. Is there any other work-related limitations with respect to stressful tasks or things of that nature that are supported?

A[:] No, your honor.

(R. 109-13.) As to the opinions of Dr. Schenck, Dr. Butler testified that Dr. Schenck's reading of her social functioning was more severe than the standardized testing in terms of her social functioning and did not seem to address some improvement in social functioning that were reflected in his treatment notes, subsequent to leaving her husband. (R. 113.)

C.    **Testimony of the Vocational Expert**

The VE was presented with the following hypothetical by the ALJ:

Q[:] So, Mr. Russel, if you would please consider a younger individual as defined in our regulatory age categories who has a high school completed education and past relevant work with respect to personal care attendant as set forth in your testimony and analysis. And who, from my initial inquiry, is limited to simple, routine, repetitive, 3-4 step tasks and instructions that are consistent with SVP: 1 or SVP: 2 as defined in the Dictionary of Occupational Titles, and occasional brief and superficial contact with coworkers, supervisors, and the public. However, these are tasks that cannot be performed independently, meaning they would not require independent collaboration or teamwork with coworkers for completion, and they would not require direct interaction with or serving the public for completion of the tasks. So, just within this initial level of limitation, would it allow for performance of past relevant work?

(R. 116-17.)

The VE testified at the hearing that such a person would not be allowed to perform Plaintiff's past relevant work, but concluded that such a person could perform unskilled work including as a packager, laundry presser, and laundry worker. (R. 117.) In terms of how absences would impact the occupations cited by the VE or employment in general, the VE testified as follows:

A[:] Well, in terms of leaving early or coming in late, I would associate that with the time off-task. Again, if it's 20 percent on a repeated basis it's likely to cost an individual their job. In terms of absences, I look at that as a different issue. And there, even a day a month on a repeated basis, I believe would preclude most employment settings.

(R. 121-22.)

## III.    <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. §

405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'"  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.  <u>DISCUSSION</u>

Plaintiff raises two errors in the ALJ's decision that she claims require remand for further consideration.  First, Plaintiff argues that the ALJ failed to consider whether her hospitalizations and partial hospitalizations would have caused excessive absences, making her unable to sustain work on a regular consistent basis, for a continuous period of at least twelve months.  (Dkt. 12 at 6-9.)  Second, Plaintiff claimed that the ALJ committed legal error when she rejected the opinion of a treating psychiatrist, and the opinions of every single treating or examining mental health professional.  (Dkt. 12 at 9-13.)

**A.      Whether the ALJ Failed to Properly Consider Whether Plaintiff was Unable to Sustain Competitive Work Activity for any Period of at Least 12 Months**

According to Plaintiff, the ALJ is required to determine whether there is any 12-month period during the relevant time period when she may have been disabled. (Dkt. 12 at 6.) Here, Plaintiff asserts the vocational expert's testimony that an individual could not sustain employment if she were absent one or more days per month coupled with the fact that she was hospitalized, partially hospitalized, or otherwise needed extensive mental health treatment at least between 2016 and 2017 evidences that Plaintiff could not maintain sustained employment over a twelve month period. (*Id.* at 7.) Plaintiff also argues that the record related to whether she could engage in employment is incomplete based on the ALJ's failure to comply with the direct instructions of the Appeals Council on remand, as evidenced by the fact that the record still does not contain any documents related to Plaintiff's partial hospitalizations and based on the ALJ's failure to ask the medical expert about the impact of Plaintiff's worsening symptoms, as documented in the treatment records referenced by the Appeals Council regarding her hospitalizations or about her partial hospitalization program. (*Id.* at 8 (citing R. 106-14).) Plaintiff argues that 20 C.F.R. §§ 404.977(b), 916.1577(b), makes it absolutely mandatory for an ALJ to take every action which has been ordered by the Appeals Council, which the ALJ failed to do when she did not obtain any evidence or develop the record related to Plaintiff's hospitalizations and partial hospitalizations, thereby requiring remand. (Dkt. 12 at 8-9.)

Defendant counters that the ALJ complied with the Appeals Council's remand order by considering new evidence concerning Plaintiff's January 2016 hospitalization

and discharge to a partial hospitalization program, and obtained, considered and discussed numerous therapy and psychiatry records post-dating her prior decision. (Dkt. 14 at 7-11.) Even assuming that the ALJ did not consider the partial hospitalization records, Defendant argued that Plaintiff can show no harm as the record demonstrated she was scheduled to be discharged a week after February 22, 2016, that she was going to start school the following month, and that her examination findings throughout 2016 and 2017 were largely unremarkable. (Dkt. 14 at 12.) In other words, Defendant argues that the partial hospitalization records would not have changed the ALJ's determination that Plaintiff was not disabled through November 2017. (Dkt. 14 at 12.)

Defendant also rejected Plaintiff's argument that her mental health treatment would result in excessive absences precluding competitive employment, noting that ALJ considered the fact that Plaintiff was hospitalized in January and July 2016 for mental health issues, but noted that subsequent records did not reveal any additional hospitalizations that would preclude employment for a continuous period of not less than 12 months. (Dkt. 14 at 12-13.) Defendant acknowledges the emergency room treatment for depression in April 2017, but argues that she was discharged in just three hours. (Dkt. 14 at 13.) With respect to her regularly attended therapy and psychiatry appointments, Defendant asserts that there was nothing in the record indicating that Plaintiff could not arrange her medical appointments around her work schedule or that she would need to miss a full working day to attend her appointments. (Dkt. 14 at 13.)

To meet the definition of disability for DIB, the claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The same standard applies to SSI.  *See* 42 U.S.C. § 1382c(a)(3)(A).  The disability resulting from the impairment, and not just the impairment, must have lasted or be expected to last for at least twelve months.  *See Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

In this case, the VE testified that a person under the hypothetical posed by the ALJ could not perform any of the positions propounded by the VE if the individual would miss 20% of a work day on a repeated basis or would miss a day a month on a repeated basis.  (R. 121-22.)  The ALJ failed to address VE's testimony regarding attendance in her decision.  (R. 34-35.)

The record in this case demonstrates that on August 29, 2015, Plaintiff presented to the St. Cloud Hospital emergency trauma center with depression and thoughts of suicide.  (R. 734.)  She was discharged the same day, but was placed into a crisis home and received crisis services for at least a week.  (R. 692, 734-35, 750.)  There is no clear evidence in the record what the crisis home/bed and the related therapy entailed, the time commitment involved, or how long Plaintiff stayed in the crisis house.

On January 30, 2016, Plaintiff presented to the St. Cloud Hospital due to suicidal ideation and behaviors.  (R. 821.)  Plaintiff was discharged from the hospital nine days later on February 8, 2016.  However, she was discharged to a partial hospitalization program.  (R. 812.)  It is problematic that the ALJ chose to ignore the order of the Appeals Council and failed to develop the record with respect to this partial

hospitalization program.  There is no dispute that the records from this partial hospitalization, if any, were neither obtained or considered by the ALJ or the ME.  As such, the Court has no knowledge as to how extensive this program was in terms of time commitment and how this affected Plaintiff's ability to sustain attendance.  On February 22, 2016, Plaintiff reported that she anticipated being discharged from the partial program the following week.  Assuming that February 29, 2016 was the actual last day of partial hospitalization, that could mean an additional 19 days that Plaintiff would not be able to meet her attendance requirement.  Once again, the Court cannot be certain that it was not more than 19 days because the ALJ failed to comply with the Appeals Council's remand order and obtain the records from the partial hospitalization.

Defendant argues that Plaintiff's partial hospitalization records are not necessary, as the evidence shows that she was doing much better after the hospitalization based on the fact that she was enrolling in school starting in April 2016.  (Dkt. 14 at 12.) However, using this as evidence of meaningful improvement is troubling considering that the record also shows that as of May 4, 2016, she was dropping out of the school.  (R. 848, 869.)

In any event, only a few months later, Plaintiff again presented at the emergency room on July 1, 2016 for evaluation of suicidal ideation and cutting.  (R. 924, 932, 935.) Plaintiff was hospitalized and was discharged from the hospital two weeks later on July 14, 2016.  (R. 924-25.)

On April 15, 2017, Plaintiff was seen at the St. Cloud Hospital emergency room with representations that over the past couple weeks her depression had been getting

worse, that she had some suicidal thoughts and thought about taking her pills or cutting herself. (R. 953.) The hospital made a referral for Plaintiff to the adult partial hospitalization program. (R. 957.) There is no evidence in the record regarding how long this partial hospitalization lasted, if it occurred, or what it entailed, and no evidence that the ALJ or the ME considered the second partial hospitalization, if any. Similarly, while Plaintiff sought and obtained a referral to a day treatment program by Dr. Schenck in May 2017 (R. 905), the record contains no mention of whether she engaged in this program or the time commitment involved.

Even ignoring the extensive treatment appointments Plaintiff had in between 2015 and 2017, the record strongly indicates that she may have had repeated medical lapses over several months during this period that would have required significant time away from work over a 12-month period due to her mental health impairments. Pursuant to the ALJ's hypothetical, such a hypothetical person would not be qualified for the unskilled position of packager, laundry presser, and laundry worker. (R. 121-22.)

That said, the record is incomplete as to the extent of the treatment as it relates to her crisis house stay in 2015, her partial hospitalization in 2016, her apparent partial hospitalization in 2017, and possible participation in a day treatment program.

As to the partial hospitalization in 2016, the Appeals Council found that [a]lthough the claimant's psychiatric condition stabilized with treatment during her hospital stay, she was discharged to a partial hospitalization program on February 8, 2016, which indicates her symptoms were severe enough to require continued intensive treatment." (R. 212.) The ALJ was then instructed to obtain additional evidence, which

would necessarily include evidence regarding the partial hospitalization relied upon by the Appeals Council. Yet the ALJ inexplicably failed to do so.[4] The Commissioner's regulations provide that a "administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). While courts have split on whether there is any error by an ALJ for failing to follow an Appeals Council remand order, where the subsequent Appeals Council does not object, *see Michael R. v. Berryhill*, No. 18-CV-241-NEB-KMM, 2019 WL 5149978, at *4 (D. Minn. June 11, 2019), *R.&R. adopted sub nom.*, 2019 WL 4233852 (D. Minn. Sept. 6, 2019), the Eighth Circuit has concluded that a federal agency, such as the SSA, is bound to follow its regulations, *see Carter v. Sullivan*, 909 F.2d 1201, 1202 (8th Cir. 1990) (per curium) ("an agency's failure to follow its own binding regulations is a reversible abuse of discretion") (citing *City of Sioux City v. Western Area Power Admin.*, 793 F.2d 181, 182 (8th Cir. 1986; *Suciu v. Immigration & Naturalization Serv.*, 755 F.2d 127, 129 (8th Cir. 1985)); *see also United States v. Nixon*, 418 U.S. 683, 695-96 (1974) (concluding that a federal agency is bound to follow its own regulations).

Regardless of the ALJ's duty to fully follow the Appeals Council's remand order, the ALJ has a duty to fully and fairly develop the record as to all of partial

---

[4] The Court acknowledges that the ALJ mentions in her decision that Plaintiff was discharged from her 2016 hospitalization to follow up with a partial hospitalization program. (R. 26 (citing Exhibit 22F).) However, the ALJ does not cite to any partial hospitalization records, only the discharge record for her preceding 2016 inpatient hospitalization. (R. 26, 811-828.)

hospitalizations, crisis home treatments, or other time intensive treatment programs from 2015 through 2017. *See Scott v. Astrue*, 529 F.3d 818, 824 (8th Cir. 2008) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)) (The "ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to present [her] case."); *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) (finding that an ALJ must fully and fairly develop the record so that a just determination of disability may be made). The Court is not convinced that this duty has been met on this record, and therefore a remand for more fact development is necessary. With a more developed record, the ALJ can make an adequate determination as to whether Plaintiff was unable to work between 2015 and 2017, within the confines of the VE's testimony regarding work attendance requirements, for a continuous period of not less than 12 months based on her severe mental impairments. *See* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A).

**B.    Conclusion**

The Court finds that this case should be remanded back to the ALJ consistent with this Report and Recommendation.[5]

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

---

[5]    Because the Court has determined remand for further development of the record is appropriate, it does not reach Plaintiff's second argument regarding treating professionals.

1.     Plaintiff's Motion for Summary Judgment (Dkt. 11) be **GRANTED IN PART and DENIED IN PART**;

2.     This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Report and Recommendation;

3.     Defendant Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. 13) be **DENIED**; and

4.     That this case be **DISMISSED WITH PREJUDICE**.

DATED: January 31, 2020            *s/Elizabeth Cowan Wright*
                                    ELIZABETH COWAN WRIGHT
                                    United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).